1

2

3

FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Sep 11, 2023

SEAN F. McAVOY, CLERK

4

5

6

7

UNITED STATES DISTRICT COURT

8

EASTERN DISTRICT OF WASHINGTON

9

10    ALLEN C., [1]

11                        Plaintiff,

12         v.

13    KILOLO KIJAKAZI,
      COMMISSIONER OF SOCIAL
14    SECURITY,

15                        Defendant.

NO:  1:21-CV-03091-LRS

ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT AND GRANTING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT

16

17         BEFORE THE COURT are the parties' cross-motions for summary judgment.

18    ECF Nos. 13, 16.  This matter was submitted for consideration without oral

19    argument.  Plaintiff is represented by attorney D. James Tree.  Defendant is

20    _____
      [1] The court identifies a plaintiff in a social security case only by the first name and

21    last initial in order to protect privacy.  See LCivR 5.2(c).

ORDER - 1

represented by Special Assistant United States Attorney Lisa Goldoftas.  The Court, having reviewed the administrative record and the parties' briefing, is fully informed.  For the reasons discussed below, Plaintiff's Motion, ECF No. 13, is denied and Defendant's Motion, ECF No. 16, is granted.

## JURISDICTION

Plaintiff Allen C. (Plaintiff), filed for supplemental security income (SSI) on December 6, 2018, and alleged an onset date of April 5, 2018, which was later amended to December 6, 2018.  Tr. 45, 282-95.  Benefits were denied initially, Tr. 220-28, and upon reconsideration, Tr. 232-38.  Plaintiff appeared at a hearing before an administrative law judge (ALJ) on September 3, 2020.  Tr. 33-87.  On October 20, 2020, the ALJ issued an unfavorable decision, Tr. 12-30, and on May 18, 2021, the Appeals Council denied review.  Tr. 1-6.  The matter is now before this Court pursuant to 42 U.S.C. § 1383(c)(3).

## BACKGROUND

The facts of the case are set forth in the administrative hearing and transcripts, the ALJ's decision, and the briefs of Plaintiff and the Commissioner, and are therefore only summarized here.

Plaintiff was 43 years old at the time the application was filed.  Tr. 26.  He went to school through the eighth grade.  Tr. 47.  He has work experience as a maintenance mechanic.  Tr. 51.  Plaintiff testified that he has difficulty focusing.  Tr. 48.  His driver's license was suspended but he has not renewed it because he cannot

drive due to the pain medications he takes.  Tr. 49.  His medications make him

sleepy and tired.  Tr. 60.  He has numbness and pain in his arms.  Tr. 61-62.  He gets

chest pain and shortness of breath if he walks too much, stands up too fast, or goes

up stairs.  Tr. 63.  His hands and feet swell.  Tr. 63-64.  He has back and hip pain.

Tr. 63.  He has sleep apnea.  Tr. 65.  He uses a cane for longer walks.  Tr. 50.  He

wears a back brace.  Tr. 50-51.   He has about three bad days a week where he

cannot get up.  Tr. 70.  Plaintiff testified that he feels anxious a lot and has frequent

panic attacks.  Tr. 72-73.

## STANDARD OF REVIEW

A district court's review of a final decision of the Commissioner of Social

Security is governed by 42 U.S.C. § 405(g).  The scope of review under § 405(g) is

limited; the Commissioner's decision will be disturbed "only if it is not supported by

substantial evidence or is based on legal error."  *Hill v. Astrue*, 698 F.3d 1153, 1158

(9th Cir. 2012).  "Substantial evidence" means "relevant evidence that a reasonable

mind might accept as adequate to support a conclusion."  *Id*. at 1159 (quotation and

citation omitted).  Stated differently, substantial evidence equates to "more than a

mere scintilla[,] but less than a preponderance."  *Id.* (quotation and citation omitted).

In determining whether the standard has been satisfied, a reviewing court must

consider the entire record as a whole rather than searching for supporting evidence in

isolation.  *Id.*

In reviewing a denial of benefits, a district court may not substitute its

judgment for that of the Commissioner. *Edlund v. Massanari*, 253 F.3d 1152, 1156

(9th Cir. 2001). If the evidence in the record "is susceptible to more than one

rational interpretation, [the court] must uphold the ALJ's findings if they are

supported by inferences reasonably drawn from the record." *Molina v. Astrue,* 674

F.3d 1104, 1111 (9th Cir. 2012). Further, a district court "may not reverse an ALJ's

decision on account of an error that is harmless." *Id*. An error is harmless "where it

is inconsequential to the [ALJ's] ultimate nondisability determination." *Id*. at 1115

(quotation and citation omitted). The party appealing the ALJ's decision generally

bears the burden of establishing that it was harmed. *Shinseki v. Sanders*, 556 U.S.

396, 409-10 (2009).

## FIVE-STEP EVALUATION PROCESS

A claimant must satisfy two conditions to be considered "disabled" within the

meaning of the Social Security Act. First, the claimant must be "unable to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than twelve months." 42

U.S.C. § 1382c(a)(3)(A). Second, the claimant's impairment must be "of such

severity that he is not only unable to do his previous work[,] but cannot, considering

his age, education, and work experience, engage in any other kind of substantial

gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

ORDER - 4

1    The Commissioner has established a five-step sequential analysis to determine

2  whether a claimant satisfies the above criteria.  *See* 20 C.F.R. § 416.920(a)(4)(i)-(v).

3  At step one, the Commissioner considers the claimant's work activity.  20 C.F.R. §

4  416.920(a)(4)(i).  If the claimant is engaged in "substantial gainful activity," the

5  Commissioner must find that the claimant is not disabled.  20 C.F.R. § 416.920(b).

6    If the claimant is not engaged in substantial gainful activity, the analysis

7  proceeds to step two.  At this step, the Commissioner considers the severity of the

8  claimant's impairment.  20 C.F.R. § 416.920(a)(4)(ii).  If the claimant suffers from

9  "any impairment or combination of impairments which significantly limits [his or

10 her] physical or mental ability to do basic work activities," the analysis proceeds to

11 step three.  20 C.F.R. § 416.920(c).  If the claimant's impairment does not satisfy

12 this severity threshold, however, the Commissioner must find that the claimant is not

13 disabled.  20 C.F.R. § 416.920(c).

14    At step three, the Commissioner compares the claimant's impairment to

15 severe impairments recognized by the Commissioner to be so severe as to preclude a

16 person from engaging in substantial gainful activity.  20 C.F.R. § 416.920(a)(4)(iii).

17 If the impairment is as severe or more severe than one of the enumerated

18 impairments, the Commissioner must find the claimant disabled and award benefits.

19 20 C.F.R. § 416.920(d).

20    If the severity of the claimant's impairment does not meet or exceed the

21 severity of the enumerated impairments, the Commissioner must pause to assess the

claimant's "residual functional capacity."  Residual functional capacity (RFC),

defined generally as the claimant's ability to perform physical and mental work

activities on a sustained basis despite his or her limitations, 20 C.F.R. §

416.945(a)(1), is relevant to both the fourth and fifth steps of the analysis.

At step four, the Commissioner considers whether, in view of the claimant's

RFC, the claimant is capable of performing work that he or she has performed in the

past (past relevant work).  20 C.F.R. § 416.920(a)(4)(iv).  If the claimant is capable

of performing past relevant work, the Commissioner must find that the claimant is

not disabled.  20 C.F.R. § 416.920(f).  If the claimant is incapable of performing

such work, the analysis proceeds to step five.

At step five, the Commissioner should conclude whether, in view of the

claimant's RFC, the claimant is capable of performing other work in the national

economy.  20 C.F.R. § 416.920(a)(4)(v).  In making this determination, the

Commissioner must also consider vocational factors such as the claimant's age,

education and past work experience.  20 C.F.R. § 416.920(a)(4)(v).  If the claimant

is capable of adjusting to other work, the Commissioner must find that the claimant

is not disabled.  20 C.F.R. § 416.920(g)(1).  If the claimant is not capable of

adjusting to other work, analysis concludes with a finding that the claimant is

disabled and is therefore entitled to benefits.  20 C.F.R. § 416.920(g)(1).

The claimant bears the burden of proof at steps one through four above.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).  If the analysis proceeds to

step five, the burden shifts to the Commissioner to establish that (1) the claimant is capable of performing other work; and (2) such work "exists in significant numbers in the national economy."  20 C.F.R. § 416.960(c)(2); *Beltran v. Astrue*, 700 F.3d 386, 389 (9th Cir. 2012).

## ALJ'S FINDINGS

At step one, the ALJ found Plaintiff has not engaged in substantial gainful activity since December 6, 2018, the application date.  Tr. 18.  At step two, the ALJ found that Plaintiff has the following severe impairments:  degenerative disc disease; status post right knee meniscal tear; right lateral epicondylitis; right carpal tunnel syndrome; obesity; obstructive sleep apnea; learning disorder; anxiety; depression; trauma and stressor related disorder; and congestive heart failure.  Tr. 18.  At step three, the ALJ found Plaintiff that does not have an impairment or combination of impairments that meets or medically equals the severity of a listed impairment.  Tr. 18.

The ALJ then found that Plaintiff has the residual functional capacity to perform sedentary work with the following additional limitations:

> He can frequently climb ramps and stairs, can never climb ladders, ropes, or scaffolds, occasionally stoop, never kneel or crawl, and can frequently crouch.  The claimant can frequently handle with his right upper extremity and frequently reach overhead with the bilateral upper extremities.  He must avoid concentrated exposure to vibrations and to hazards such as unprotected heights.  The claimant can perform simple routine repetitive tasks performed in a static environment that would experience little to no changes, and any changes that might occur would be gradually introduced, explained, and/or demonstrated. He can have no strict time or strict high production quotas, and can

ORDER - 7

have superficial interaction with others meaning can work around others but should not engage in any time of arbitration, sales, management direction, or negotiation with others.

Tr. 20.

At step four, the ALJ found that Plaintiff is unable to perform any past relevant work.  Tr. 26.  At step five, after considering the testimony of a vocational expert and Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform such as telephone solicitor, final assembler, parking lot attendant, cashier II, and office helper.  Tr. 26-27.  Thus, the ALJ found Plaintiff has not been under a disability as defined in the Social Security Act since December 6, 2018, the date the application was filed.  Tr. 28.

### ISSUES

Plaintiff seeks judicial review of the Commissioner's final decision denying supplemental security income under Title XVI of the Social Security Act.  ECF No. 11.  Plaintiff raises the following issues for review:

1.    Whether the ALJ properly considered the Listings at step three;

2.    Whether the ALJ properly evaluated Plaintiff's symptom testimony

3.    Whether the ALJ properly evaluated the medical opinions; and

4.    Whether the ALJ made a legally sufficient step five finding.

ECF No. 13 at 2.

ORDER - 8

**DISCUSSION**

**A.    Step Three**

Plaintiff contends the ALJ failed to properly consider Listings 3.02 and 4.02 regarding chronic respiratory disease and congestive heart failure.  ECF No. 13 at 3-7.  At step three of the evaluation process, the ALJ must determine whether a claimant has an impairment or combination of impairments that meets or equals an impairment contained in the Listings.  See 20 C.F.R. § 416.920(d).  The Listings describe "each of the major body systems impairments [considered] to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience."  20 C.F.R. § 416.925.  "Listed impairments are purposefully set at a high level of severity because 'the listings were designed to operate as a presumption of disability that makes further inquiry unnecessary.'"  *Kennedy v. Colvin*, 738 F.3d 1172, 1176 (9th Cir. 2013) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990)).  "Listed impairments set such strict standards because they automatically end the five-step inquiry, before residual functional capacity is even considered."  *Kennedy*, 738 F.3d at 1176.  If a claimant meets the listed criteria for disability, he will be found to be disabled.  20 C.F.R. § 416.920(a)(4)(iii).

An impairment "meets" a listing if it meets all of the specified medical criteria.  *Sullivan*, 493 U.S. at 530; *Tackett*, 180 F.3d at 1098.  An impairment that manifests only some of the criteria, no matter how severely, does not qualify.  *Sullivan*, 493 U.S. at 530; *Tackett*, 180 F.3d at 1099.  An unlisted impairment or

combination of impairments "equals" a listed impairment if medical findings equal in severity to all of the criteria for the one most similar listed impairment are present. *Sullivan*, 493 U.S. at 531; *see* 20 C.F.R. § 416.926(b).

 "If a claimant suffers from multiple impairments and none of them individually meets or equals a listed impairment, the collective symptoms, signs and laboratory findings of all of the claimant's impairments will be evaluated to determine whether they meet or equal the characteristics of any relevant listed impairment." *Tackett*, 180 F.3d at 1099.  However, "[m]edical equivalence must be based on medical findings," and "[a] generalized assertion of functional problems is not enough to establish disability at step three." 20 C.F.R. § 416.926(a).  The claimant bears the burden of establishing an impairment (or combination of impairments) meets or equals the criteria of a listed impairment. *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).

### 1.  Listing 3.02C3- Chronic Respiratory Disease

Plaintiff contends the evidence shows he met Listing 3.02C3 based on his obstructive sleep apnea.  ECF No. 13 at 23-24.  The Listing is met when a claimant has a chronic impairment of gas exchange demonstrated by oxygen saturation levels less than or equal to a value based on the altitude at the test site, measured by pulse oximetry either at rest or during or after a 6-minute walk test.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.02C3.  The introduction to the listing explains the various requirements for the pulse oximetry testing, including that the claimant must

be medically stable at the time of the test; the measurements must be recorded on room air without oxygen supplementation; the pulse oximetry measurement must be stable over a 15-second interval; and the report must include the claimant's name, date of test, the altitude or location of the test, and a graphical printout of the $SpO_2$ value and pulse wave.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.00H.  Plaintiff cites findings from sleep studies dated January 31, 2020, and February 14, 2020, as evidence he meets the Listing.  ECF No. 13 at 5; Tr. 487-97.

While Plaintiff contends his sleep apnea should be considered under the respiratory listings, there is no legal support for this contention.  ECF No. 13 at 4.  The explanatory section of the respiratory listings indicates that sleep related breathing disorders, such as sleep apnea, are evaluated based on the complications caused to other parts of the body under the listings for the affected body systems, such as hypertension, heart failure, and disturbance in mood or cognition.  20 C.F.R. § 404, Subpt. P, App. 1, § 3.00P.

Even if the ALJ should have considered Listing 3.02C3, Plaintiff cites one finding of venous $O_2$ saturation at 73% in November 2019.  ECF No. 13 at 5 (citing Tr. 512).  First, this does not demonstrate a "chronic" impairment as required by the listing.  *See* Tr. 421, 438, 450, 456, 464, 559, 568 (recording pulse oximetry readings from 94% to 98% between May 2018 and December 2019).  Second, the record cited by Plaintiff does not contain the required documentation of the November 2019 pulse oximetry test showing 73% venous $O_2$ saturation, involving

the stability of the measurements over 15-second intervals and graphical display of

$SpO_2$ and pulse wave.  Tr. 512.  The record does not contain evidence of a listing-

level breathing disorder and the ALJ did not err by failing to consider Listing

3.02C3.

### 2. Listing 4.02 – Chronic Heart Failure

Plaintiff contends the evidence shows he met Listing 4.02 based on his

congestive heart failure.  ECF No. 13 at 23-24.  In full, Listing 4.02 provides as

follows:

> 4.02 Chronic heart failure while on a regimen of prescribed treatment,
> with symptoms and signs described in 4.00D2. The required level of
> severity for this impairment is met when the requirements in both A
> and B are satisfied.
>
> A. Medically documented presence of one of the following:
> 1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic
> dimensions greater than 6.0cm or ejection fraction of 30 percent or
> less during a period of stability (not during an episode of acute heart
> failure); or
> 2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior
> wall plus septal thickness totaling 2.5 cm or greater on imaging, with
> an enlarged left atrium greater than or equal to 4.5 cm, with normal or
> elevated ejection fraction during a period of stability (not during an
> episode of acute heart failure);
> AND
>
> B. Resulting in one of the following:
> 1. Persistent symptoms of heart failure which very seriously limit the
> ability to independently initiate, sustain, or complete activities of daily
> living in an individual for whom an MC, preferably one experienced
> in the care of patients with cardiovascular disease, has concluded that
> the performance of an exercise test would present a significant risk to
> the individual; or
> 2. Three or more separate episodes of acute congestive heart failure
> within a consecutive 12-month period (see 4.00A3e), with evidence of

ORDER - 12

fluid retention (see 4.00D2b(ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

20 C.F.R. Part 404, subpart P, Appendix 1, Listing 4.02. For a claimant to be found disabled under this Listing, he needs to establish the requirements in part A as well as part B; part A alone is insufficient. *See Sullivan*, 493 U.S. at 530.

Plaintiff contends six hospital visits between November and January 2020 establish that he meets the Listing. ECF No. 13 at 5-6. Before reaching the analysis of the level of severity in subparts of the Listing, however, Plaintiff must first show "[c]hronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2." In November 2019, Plaintiff presented in the emergency department for shortness of breath. Tr. 471. He was diagnosed with new onset congestive heart failure. Tr. 474. Cardiomegaly was noted on his chest x-ray and his BNP was elevated. Tr. 479. A urine drug screen was positive for amphetamines, though Plaintiff denied use. Tr. 479. The doctor acknowledged it

could be a false positive, "however clinical presentation . . . would be consistent

with intoxication." Tr. 480.  Plaintiff left the hospital against medical advice.  Tr.

474.  Congestive heart failure was a new diagnosis, so Plaintiff was not on a regimen

of prescribed treatment at that time.

On January 19, 2020, Plaintiff again presented in the emergency department

with shortness of breath and was admitted.  Tr. 468-69.  He was discharged after five

days.  Tr. 481.  The discharge summary noted, "[t]he patient does not give an

accurate history and tends to go around questions regarding compliance."  Tr. 481.

He reported running out of medications three weeks prior.  Tr. 481.  An

echocardiogram confirmed systolic/diastolic congestive heart failure, with etiology

likely methamphetamine abuse.  Tr. 482.  A coronary angiogram was discussed, but

the cardiologist recommended against it.  "He would like to see the patient be

compliant with his meds and care before doing an angiogram (as any stents placed

will need compliance with meds to ensure no adverse events take place)."  Tr. 482.

The record indicates noncompliance with treatment, which means that Plaintiff had

not been on a regimen of prescribed treatment, and he does not meet the listing.

Next, the record does not reflect that Plaintiff meets the requirements of

Listing 4.0A, although he was diagnosed with systolic/diastolic congestive heart

failure.  Both subparts of 4.0A require certain measurements "during a period of

stability."  Plaintiff himself characterizes the November 2019 to January 2021

hospital visits as "acute CHF events."  ECF No. 13 at 6.  The measurements taken

1    during those acute episodes are not representative of a period of stability.

2    Furthermore, even if the measurements taken suffice under Listing 4.02, Plaintiff

3    does not allege that the measurement was consistent for a period of 12 months or

4    more.  Likewise, Plaintiff did not establish that his ejection fraction was below or

5    would be expected to be below 30% for a period of 12 months or more.  In fact,

6    during the January 2020 episode, it was noted that his ejection fraction appeared to

7    have improved to 25-30% from previous testing.  Tr. 482.  Plaintiff points to the

8    ALJ's step two finding that his congestive heart failure would be expected to last for

9    12 months, but that is not a finding at step three Plaintiff's symptoms would

10   continue at listing level with treatment.

11          Lastly, the requirements of Listing 4.02B are not established in the record.

12   Plaintiff asserts he meets Listing 4.02B2 because he experienced six acute episodes

13   of congestive heart failure requiring hospital care.  The Listing requires three or

14   more separate episodes of acute congestive heart failure within a consecutive 12-

15   month period, with evidence of fluid retention from clinical and imaging

16   assessments at the time of the episodes, requiring acute extended physician

17   intervention such as hospitalization or emergency room treatment for 12 hours or

18

19

20

21

more, separated by periods of stabilization.  Notably, documents from only two hospital visits for congestive heart failure are in the record.[2]

Plaintiff also argues he meets Listing 4.02B because performance of an exercise tolerance test was contraindicated by severe arterial hypertension under Listing 4.00C8.  ECF No. 13 at 7.  However, Listing 4.00C8 indicates that a medical consultant must find that the claimant has one of the risk factors identified in the Listing, and no such finding is in the record.  Plaintiff argues that there is evidence he would not be able to perform the exercise tolerance test because of a diastolic blood pressure reading of greater than 110 mmHg in November 2019.  ECF No. 13 at 7.  However, by January 2020, Plaintiff's diastolic blood pressure was measured at 78 and his blood pressure was described as "well controlled."  Tr. 481-82.  The evidence does not indicate that Plaintiff met the criteria for Listing 4.02B.  The ALJ did not err by failing to consider Listing 4.02.

---

[2] Plaintiff reported he had been to a different hospital four times between his November 2019 ER visit and his January 2020 hospital stay.  Tr. 481.  Those visits are not otherwise documented in the record, except for a note in his January discharge summary references an angiogram done at the other hospital indicating an ejection fraction of 15-20%.  Tr. 482.  The Court notes the lack of records not to question whether those visits occurred, but only to observe that any findings are not documented.

### 3. Equivalency

Plaintiff argues that the combined effect of his impairments equals a listing. ECF No. 13 at 5-6. "An ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *Burch*, 400 F.3d at 683. An ALJ does not have an obligation to discuss medical equivalency *sua sponte* and does not err by failing to do so when the issue was not argued or explained at the hearing. *See Ford v. Saul*, 950 F.3d 1141, 1157 (9th Cir. 2020). In this case, the issue of equivalency was raised for the first time in summary judgment briefing. ECF No. 13. Thus, the ALJ did not err by failing to specifically discuss equivalency in the decision.

**B.    Symptom Testimony**

Plaintiff contends the ALJ improperly considered his symptom testimony. ECF No. 13 at 7-15. An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. "First, the ALJ must determine whether there is objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Molina*, 674 F.3d at 1112 (internal quotation marks omitted). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if [the ALJ] gives 'specific, clear and convincing reasons' for the

rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (internal citations and quotations omitted).

First, the ALJ found the record includes statements, reports, and observations from others that are inconsistent with Plaintiff's allegations. Tr. 21-22. The ALJ evaluates a claimant's statements for their consistency, both internally and with other information in the case record. Social Security Ruling 16-3p, 2017 WL 5180304, at *5 (effective October 25, 2017). For example, on Plaintiff's function report, when asked if he spends time with others in person, on the phone, or on the computer, he marked "No," yet when his mother completed a function report, when asked if Plaintiff spends time with others, she marked "Yes" and indicated that "some friends [and] family will stop by to check on him" once a week. Tr. 324, 348. Plaintiff asserts that he spends time with others in the home and "primarily with family," and argues this is not an inconsistency. ECF No. 13 at 14. However, the ALJ's inference from the differing statements is reasonable because they suggest that Plaintiff is not as isolated as he alleges.

The ALJ noted that although Plaintiff asserted trouble with concentration and attention, Tr. 352, on at least one occasional he told a treating provider that he had no difficulty with concentration. Tr. 22, 418. However, Plaintiff observes and Defendant concedes that on multiple occasions, he reported difficulty with concentration. ECF No. 13 at 14 (citing Tr. 434, 446, 453, 460, 540, 548); ECF No. 16 at 15. Furthermore, the ALJ found Plaintiff has a moderate limitation in

concentration at step two and included limitations associated with concentration in

the RFC.  Tr. 19-20.  This is not substantial evidence of an inconsistency in the

evidence; however, any error is harmless because the ALJ cited other examples

and reasons supported by substantial evidence.  As long as there is substantial

evidence supporting the ALJ's decision and the error does not affect the ultimate

nondisability determination, the error is harmless.  *See Carmickle v. Comm'r of*

*Soc. Sec. Admin*, 533 F.3d 1155, 1162 (9th Cir. 2008); *Stout v. Comm'r of Soc.*

*Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006); *Batson v. Comm'r of Soc. Sec.*

*Admin*, 359 F.3d 1190, 1195-97 (9th Cir. 2004).

Next, the ALJ noted that Plaintiff testified he uses a cane, yet treatment

records do not mention the need for or use of a cane or other assistive device and

there is no evidence of deficits in gait.  Tr. 22 (citing 412-65, 530-70), 50, 64-68.

The ALJ also observed that treating providers specifically noted that Plaintiff is not

at risk of falling and he denied having any fall.  Tr. 22 (citing *e.g.*, Tr. 459, 463,

542, 550).  The medical record supports the ALJ's conclusion.  Additionally, the

ALJ observed that a hospital physician noted Plaintiff "does not give an accurate

history and tends to go around questions regarding compliance."  Tr. 474.  This is

reasonably considered in evaluating the supportability of Plaintiff's symptom

statements.

Last, the ALJ noted the record documents inconsistent reporting regarding methamphetamine use.  Tr. 22.  Plaintiff noted a history of methamphetamine use during his consultative exam in April 2019.  Tr. 403.  When Plaintiff sought emergency room treatment for shortness of breath in November 2019, the treating provider indicated Plaintiff's symptoms were consistent with methamphetamine use, and a drug test was positive for methamphetamine, but Plaintiff denied use. Tr. 480, 482.  Plaintiff then told his primary provider that he was a chronic user later that month.  Tr. 565.  An ALJ may reject a claimant's testimony if his statements are inconsistent.  *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001).  These are inconsistencies supported by substantial evidence and were reasonably considered by the ALJ in evaluating Plaintiff's symptom claims.

Second, the ALJ found the exam findings throughout the record are inconsistent with Plaintiff's allegations of extremely limiting physical conditions. Tr. 22.  While subjective pain testimony may not be rejected solely because it is not corroborated by objective medical findings, the medical evidence is a relevant factor in determining the severity of a claimant's pain and its disabling effects. *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001). The ALJ observed that findings regarding Plaintiff's right side carpal tunnel syndrome included positive Tinel's and Phalen's, slightly reduced grip strength on the right, but 5/5 strength in all other areas.  Tr. 22, 393.   A nerve conduction study found moderate right carpal tunnel syndrome, with normal right ulnar nerve, and tennis elbow.  Tr. 394.

On exam, Plaintiff's back had tenderness on palpation and some spasms, but inconsistent straight leg raise testing.  Tr. 22, 421, 438, 464.  Plaintiff asserts the ALJ should have considered his "Listing-level" heart condition and sleep apnea, ECF No. 13 at 22, but as discussed *supra*, but neither condition meets a listing.[3]  Plaintiff cites the same records cited by the ALJ and restates the findings, and some similar findings, ECF No. 14 at 9, but the ALJ reasonably interpreted the record as not supporting Plaintiff's allegations of "extremely limiting physical conditions."

The ALJ also noted that Plaintiff routinely appeared in no acute distress or with normal constitution.  Tr. 22 (citing e.g., Tr. 398, 421, 438, 450, 468, 471, 544, 552, 559).  The ALJ observed that Plaintiff rarely appeared otherwise, with an exception when he appeared anxious at the time he sought treatment for shortness of breath in November 2019.  Tr. 22, 477.  Plaintiff argues the ALJ improperly considered his presentation, ECF No. 13 at 9, but the ALJ explained that given his allegations of constant, disabling pain and other symptoms, it would seem likely that his medical providers would have noted distress, discomfort, or observations of pain during appointments.  Tr. 22.  The ALJ concluded the absence of such observations is inconsistent with Plaintiff's allegations of extremely limiting pain

---

[3] The ALJ accounted for Plaintiff's heart condition by reducing the RFC from light work to sedentary.  Tr. 24.

and constant symptoms.  Tr. 22.  The ALJ's inference from the absence of findings

is reasonable and this is a clear and convincing reason supported by substantial

evidence.

Third, the ALJ found Plaintiff's performance on mental status exams and

treatment notes reflecting minimal psychiatric observations are inconsistent with

Plaintiff's allegations of extremely limiting mental health symptoms.  Tr. 23.  The

ALJ noted Plaintiff' mental status exam included normal findings (citing *e.g.*, Tr.

398), even when he presented with a depressed mood, (citing *e.g.*, Tr. 425).  Tr. 23.

The ALJ also observed the mental status exam findings of examining psychologist

Patrick Metoyer, Ph.D., were essentially normal, except for mild impairment in

concentration, despite an "anxious, frustrated, depressed, down" mood.  Tr. 403-

04.  He had a normal mood and affect when he presented in the emergency room

for shortness of breath in January 2020, Tr. 468, and following his hospital stay,

Tr. 564.  Tr. 23.  Although Plaintiff argues the ALJ did not explain how these

findings are inconsistent with Plaintiff's allegations, the ALJ stated that given

Plaintiff's allegations of significant problems with anxiety and panic attacks, it

would be reasonable to expect treating providers to document anxiety or

psychiatric symptoms, whether observed or reported.  Tr. 23.  This is a clear and

convincing reason supported by substantial evidence.

1    Fourth, the ALJ found that conservative treatment and Plaintiff's lack of

2    engagement in treatment indicate that his symptoms are not as severe as alleged.

3    Tr. 23-24.  This is a permissible inference.  *See Parra v. Astrue,* 481 F.3d 742,

4    750–51 (9th Cir.2007) (stating that "evidence of 'conservative treatment' is

5    sufficient to discount a claimant's testimony regarding severity of an

6    impairment"); *see also Meanel v. Apfel,* 172 F.3d 1111, 1114 (9th Cir.1999)

7    (rejecting subjective pain complaints where petitioner's "claim that [he]

8    experienced pain approaching the highest level imaginable was inconsistent with

9    the 'minimal, conservative treatment' that [he] received").  The ALJ noted that

10   Plaintiff was issued a night splint for carpal tunnel syndrome.  Tr. 23, 392.  In May

11   2018, when Plaintiff complained of back pain, his treating provider, Caryn

12   Jackson, M.D., wrote that, "it is difficult to justify [patient] not looking for work as

13   [patient] has not been undergoing any treatment for his pain such as physical

14   therapy."  Tr. 23, 458.  Dr. Jackson referred Plaintiff to physical therapy several

15   times but there is no indication that Plaintiff ever followed through.  Tr. 23, 416,

16   444, 452, 458.  Dr. Jackson also recommended conservative treatment of gentle

17   stretching and light exercises.  Tr. 23, 416, 433.  Plaintiff was encouraged to

18   exercise or increase his activity level.  Tr. 23 (citing *e.g.*, 416, 538).  The ALJ

19   observed that recommendations that Plaintiff exercise are inconsistent with his

20   allegations that his impairment prevented him from engaging in any significant

21   activity.  Tr. 23.

1    The ALJ also observed that Plaintiff had no mental health treatment and was

2    not taking psychiatric medication at the time of his consultative psychological

3    exam. Tr. 23, 402. The following month he discussed depression, but there is no

4    indication he began mental health treatment. Tr. 424-32. The ALJ noted that later

5    visits to primary care providers do not describe ongoing treatment for psychiatric

6    concerns, other than one prescription for depression and anxiety in December

7    2019. Tr. 24, 539, 546-48, 556. Plaintiff asserts the ALJ improperly considered

8    his lack of mental health treatment. ECF No. 13 at 13 (citing SSR 16-3p; *Nguyen*

9    *v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996)). However, when there is no

10   evidence suggesting a failure to seek treatment is attributable to a mental

11   impairment rather than personal preference, it is reasonable for the ALJ to

12   conclude that the level or frequency of treatment is inconsistent with the level of

13   complaints. *Molina*, 674 F.3d at 1113-14. Furthermore, despite Plaintiff's

14   allegation to the contrary, the ALJ also considered possible reasons for Plaintiff's

15   failure to seek treatment, including, for example, lack of access to care or

16   effectiveness of treatment, but found that Plaintiff had not alleged any reason that

17   justify the inconsistency. Tr. 24 (citing SSR 16-3p). Thus, the ALJ reasonably

18   concluded that Plaintiff's minimal engagement with treatment is inconsistent with

19   his alleged symptoms. Tr. 24. This is a clear and convincing reason supported by

20   substantial evidence.

21

## C.    Medical Opinions

Plaintiff argues the ALJ failed to properly evaluate the opinions of C. Jackson, M.D., and P. Metoyer, Ph.D.  ECF No. 13 at 15-20.

For claims filed on or after March 27, 2017, the regulations provide that the ALJ will no longer "give any specific evidentiary weight…to any medical opinion(s)…"  *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 2017 WL 168819, 82 Fed. Reg. 5867-88 (Jan. 18, 2017); 20 C.F.R. § 416.920c.[4]  Instead, an ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings from medical sources. 20 C.F.R. § 416.920c(a) and (b).  Supportability and consistency are the most important factors in evaluating the persuasiveness of medical opinions and prior administrative findings, and therefore the ALJ is required to explain how both factors were considered.  20 C.F.R. § 416.920c(b)(2).  The ALJ may, but is not

---

[4] Plaintiff argues the "specific and legitimate" standard continues to apply despite the new regulations.  ECF No. 13 at 16.  The Ninth Circuit has concluded that the new regulations displace the "irreconcilable" and "incompatible" specific and legitimate reasons standard.  *Woods v. Kijakazi*, 32 F.4th 785, 790-92 (9th Cir. 2022).

ORDER - 25

required, to explain how other factors were considered.  20 C.F.R. §

416.920c(b)(2); *see* 20 C.F.R. § 416.920c(c)(1)-(5).

     *1.  Caryn Jackson, M.D.*

     Dr. Jackson completed DSHS "Documentation Request for Medical or

Disability Condition" forms in April 2018, April 2019, and March 2020.  Tr. 406-

08, 522-24.  In each opinion, Dr. Jackson indicated that Plaintiff was limited to

working 1-10 hours per week and sedentary work.  Tr. 406, 408-09, 410, 522-23.

The ALJ found Dr. Jackson's opinions are not persuasive.  Tr. 25.

     First, with regard to supportability, the more relevant the objective medical

evidence and supporting explanations provided by a medical source to support his

or her opinion, the more persuasive the medical opinion will be.  20 C.F.R. §

416.920c(c)(1)-(2).  The ALJ found that Dr. Jackson gave little support or basis for

the opinion that Plaintiff cannot work more than 10 hours a week at the sedentary

exertional level, other than noting his diagnoses.  Tr. 25, 406, 409, 522-23.  The

ALJ noted that Dr. Jackson did not explain why Plaintiff could only work 10 hours

per week other than with general descriptions of difficulties, such as, "will have

difficulty w/ prolonged standing, walking, sitting, lifting heavy objects >20 lbs.

Repet[itive] motions + movement requiring fine motor may be difficult R>L," Tr.

406; "will have difficulty w/ prolonged standing, walking, sitting, lifting heavy

objects.  Repetitive motions involving bending, twisting also limited," Tr. 409; and

"limitation in prolonged standing, walking sitting lifting heavy objects >20 lbs.

1  Has poor heart function so prolonged exertion will be difficult," Tr. 522.  The

2  ALJ's interpretation of these statement as not explaining the basis for the hourly

3  work limit is reasonable.

4       Second, with regard to consistency, the more consistent a medical opinion is

5  with the evidence from other medical sources and nonmedical sources in the claim,

6  the more persuasive the medical opinion will be.  20 C.F.R. § 416.920c(c)(1)-(2).

7  The ALJ found that the severe limitations assessed by Dr. Jackson are inconsistent

8  with her statement in an April 2018 treatment record that, "it is difficult to justify

9  [patient] not looking for work as [patient] has not been undergoing any treatment for

10  his pain such as physical therapy." Tr. 25, 458.  The ALJ observed that Dr. Jackson

11  referred Plaintiff to physical therapy on that day and others as discussed *supra*, but

12  there is no record indicating that Plaintiff ever engaged in physical therapy.  Tr. 25.

13  The ALJ also found that the Dr. Jackson's opinions are inconsistent with the

14  minimal and mild physical limitations throughout the record and the lack of

15  observations in physical distress or discomfort, discussed *supra*.

16       Plaintiff argues the ALJ should have discuss Dr. Jackson's 2020 opinion

17  separately because it was the only opinion that addressed Plaintiff's new diagnosis

18  of congestive heart failure.  ECF No. 13 at 17.  The ALJ may analyze multiple

19  medical opinions from the same source together.  20 C.F.R. § 416.920c(b)(1).

20  Notably, despite the new diagnosis, Dr. Jackson assessed the same limitations she

21  assessed in the two prior opinions.  The ALJ did not err.   Next, Plaintiff argues that

the ALJ's assessment that Dr. Jackson provided "little support or basis" for the limitations assessed is "plainly inaccurate." ECF No. 13 at 17. Plaintiff cites Dr. Jackson's comments, which were referenced by the ALJ, that Plaintiff "would have difficulty" with various activities. ECF No. 13 at 17. Such comments are neither objective findings nor functional assessments and the ALJ's characterization of them is reasonable.

Plaintiff also argues that the inconsistency identified by the ALJ between Dr. Jackson's treatment note and her opinion should not apply to the 2020 opinion because his congestive heart failure was a new condition. ECF No. 13 at 18. However, Dr. Jackson's assessment of limitations was exactly the same, despite the new diagnosis. Even if Dr. Jackson's statement that it was difficult to support Plaintiff not looking for work does not apply to his heart condition, the ALJ's other findings related to supportability and inconsistency are supported by substantial evidence. Plaintiff argues the ALJ did not identify any inconsistencies with the objective evidence; however, the ALJ previously discussed that the objective evidence in detail, which need not be repeated to constitute substantial evidence here.

*2.  Patrick Metoyer, Ph.D.*

Dr. Metoyer completed a Mental Evaluation in April 2019 and diagnosed panic disorder, post traumatic stress disorder, and major depressive disorder, recurrent moderate.  Tr. 401-05.  His functional assessment indicated that Plaintiff has the ability to reason and understand; he has some adaptation skills; remote memory is intact; recent and immediate memory are intact; and sustained concentration and persistence are mildly impaired.  Tr. 405.  Dr. Metoyer opined that Plaintiff's ability to interact with coworkers and the public is likely moderately impaired; his ability to maintain regular attendance in the workplace is moderately impaired; his ability to complete a normal work week or work day without interruption from psychological symptoms is likely moderately impaired; and his ability to deal with the usual stress encountered in the workplace is markedly impaired if it involves persistence activity, complex tasks, task pressure, or interacting with other individuals.  Tr. 405.

With regard to supportability, the more relevant the objective medical evidence and supporting explanations provided by a medical source to support his or her opinion, the more persuasive the medical opinion will be.  20 C.F.R. § 416.920c(c)(1)-(2).   The ALJ found there is little support for Dr. Metoyer's functional assessment, as it specifically references Plaintiff's subjective statements which were given little weight.  Tr. 25.  A physician's opinion may be rejected if it is based on a claimant's subjective complaints which were properly discounted.

*Tonapetyan*, 242 F.3d at 1149; *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999); *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989). Plaintiff points out that the Ninth Circuit has clarified that professional assessment of mental illness necessarily analyzes a patient's self-reports. *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017). The Court in *Buck* held that an ALJ errs by relying on a claimant's discredited subjective reporting as a basis for rejecting the "objective measures" of a psychologist's evaluation, such as a clinical interview or mental status exam. *Id.* Here, the ALJ did not rely on Plaintiff's self-report as the sole basis for giving little weight to Dr. Metoyer's opinion. The ALJ also found Dr. Metoyer's opinion was inconsistent with the treatment record, as discussed *supra*. Further, unlike in *Buck* where the examining psychologist relied on the Plaintiff's self-report to a lesser degree than present here, Dr. Metoyer specifically stated certain aspects of the functional assessment were based on Plaintiff's report. Tr. 405; *see id.* at 1049 (noting the psychologist's opinion was influenced only by the claimant's self-report that he had trouble keeping a job). Therefore, the ALJ did not err in giving little weight to Dr. Metoyer's opinion on this basis.

The ALJ also noted Dr. Metoyer suggested some of the impairments were "likely" impairments. Tr. 25, 405. An ALJ may reject a medical opinion that fails to specify functional limitations or describes limitations equivocally. *See Ford*, 950 F.3d at 1156 (finding a physician's descriptions of the plaintiff's limitations "as 'limited' or 'fair' were not useful because they failed to specify functional

limits"); *Glosenger v. Comm'r of Soc. Sec. Admin.*, No. 3:12-cv-1774-ST, 2014 WL 1513995 at *6 (D. Or. April 16, 2014) (affirming the ALJ's rejection of limitations prefaced with language such as "might," "may," or "would also likely require."). The ALJ's finding regarding supportability is supported by substantial evidence.

With regard to consistency, the ALJ found that the limitations assessed by Dr. Metoyer are inconsistent with Plaintiff's performance on mental status exams throughout the record and the minimal psychiatric observations contained throughout the record, Tr. 25, discussed *supra*. Plaintiff argues that Dr. Metoyer's exam findings include evidence of social limitation and that mental status exam findings related to concentration, fund of knowledge, and memory impairment "could be indicative of his adaptation to stress." ECF No. 13 at 20. This argument is unpersuasive for several reasons. First, there is nothing in Dr. Metoyer's opinion or the record linking Dr. Metoyer's mental status exam findings to Plaintiff's ability to adapt to stress. Second, Dr. Metoyer stated that Plaintiff "does have some adaptation skills." Tr. 405. Third, the ALJ included mental limitations in the RFC limiting Plaintiff to simple, routine, repetitive tasks performed in a static environment with little to no changes, with gradual introduction of any change that may occur, and with no strict or high production quotas, and with some social limitations. Tr. 20. The ALJ's finding is supported by substantial evidence.

**D.     Step Five**

Plaintiff argues the ALJ improperly found that there are jobs available in significant numbers in the national economy that Plaintiff could perform with the restrictions in the RFC.  ECF No. 13 at 20-21.   At step five of the sequential evaluation analysis, the burden shifts to the Commissioner to establish that (1) the claimant is capable of performing other work; and (2) such work "exists in significant numbers in the national economy."  20 C.F.R. § 416.960I(2); *Beltran*, 700 F.3d at 389.  The Commissioner may meet the burden of showing that there is other work in significant numbers in the national economy that claimant can perform with either: (1) the testimony of a vocational expert; or (2) by reference to the Medical-Vocational Guidelines. *Id*.

Based on the testimony of the vocational expert, the ALJ found that Plaintiff could perform representative jobs of telephone solicitor (86,000 jobs available), parking lot attendant (33,000 jobs available), cashier II (47,000 jobs available), final assembler (13,000 jobs available), and office helper (10,000 jobs available).  Tr. 27. Plaintiff contends the jobs of telephone solicitor, parking lot attendant, and cashier II are not consistent with the RFC and should be eliminated from the calculation of the total jobs available in the national economy that Plaintiff could perform.  ECF No 13 at 21.

First, Defendant concedes that the job of cashier II should not be considered, as the job requires reasoning level three, *see* DOT 211.462-010, which is

inconsistent with the RFC limitation to simple, routine, repetitive tasks.  ECF No. 16 at 20 (citing *Zavalin v. Colvin*, 778 F.3d 842, 847 (9th Cir. 2015)).

Second, Plaintiff argues the job of telephone solicitor should not be considered because the vocational expert "retracted" his testimony that the job could be performed with an RFC limitation of "simple, routine, repetitive tasks."  ECF No. 13 at 21.  Defendant characterizes the vocational expert's testimony as "confusing." ECF No. 16 at 20.  Indeed, the vocational expert's testimony is not entirely clear. Tr. 82-84.  Without clarifying testimony from the vocational expert, the telephone solicitor job should be excluded from the calculation of available jobs.

Third, Plaintiff argues that the job of parking lot attendant should not be considered because the job requires the ability to park cars for customers.  ECF No. 13 at 21.  Plaintiff testified that he did not have a driver's license and could not drive while taking his medications.  Tr. 49.  However, Defendant notes that the DOT description indicates that driving may not always be required of a parking attendant. ECF No. 16 at 22.  Indeed, the job description is "[p]arks automobiles for customers in parking lot or storage garage . . . drives automobile to parking space, or points out parking space for customer's use."  DOT 915.473-010, 1991 WL 687865.  The vocational expert did not speak to the driving requirements of the position or separate the available jobs into those that require driving and those that do not. While the number of parking lot attendant jobs that do not require driving is likely greater than zero and less than 33,000, without clarifying testimony from the

vocational expert, parking lot attendant must be excluded from the calculation of available jobs.

Plaintiff argues that if the jobs of telephone solicitor, parking lot attendant, and cashier II are eliminated from the calculation of available jobs, the remaining jobs of assembler and office helper, with 23,000 jobs available combined, are insufficient to constitute jobs available in significant numbers in the national economy.  ECF No. 13 at 21.   The Ninth Circuit has not established a "bright-line rule for what constitutes a 'significant number' of jobs." *Beltran*, 700 F.3d at 389.  However, the Ninth Circuit has held the availability of 25,000 national jobs presents a "close call," but constitutes a significant number of jobs, *Gutierrez v. Comm'r of Soc. Sec. Admin.*, 740 F.3d 519, 528-29 (9th Cir. 2014), and also has held that the availability of 1,680 national jobs does not constitute a significant number of jobs. *Beltran*, 700 F.3d at 390.  The *Gutierrez* court cited Eighth Circuit precedent holding 10,000 national jobs significant.  *See Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997). "Following Gutierrez, various district courts have found that numbers near 21,000 constituted a significant number."  *Hector J. O. v. Kijakazi*, No. 5:22-CV-02025-KES, 2023 WL 3901781, at *11 (C.D. Cal. June 8, 2023); *see Anna F. v. Saul*, No. ED CV 19-511-SP, 2020 WL 7024924, at *6 (C.D. Cal. Nov. 30, 2020) (finding 21,000 jobs significant and noting "the difference between 21,100 jobs and 25,000 jobs does not seem material such that it would shift the close call the other way"); *Elizabeth M. v. Saul*, No. ED CV 20-00819-DFM, 2021 WL 1060232, at *2

(C.D. Cal. Mar. 19, 2021) ("Given the legal landscape, the Court finds that, on balance, the existence of 21,000 jobs in the national economy to be sufficient."); *see also Montalbo v. Colvin*, 231 F. Supp. 3d 846, 863 (D. Haw. 2017) (finding 12,300 jobs significant);; *Ronquillo v. Saul*, No. 1:19-cv-1665-JLT, 2021 WL 614637, at *8 (E.D. Cal., Feb. 17, 2021) (finding 24,000 jobs in the national economy significant); *Jeter v. Berryhill*, No. EDCV 17-1930 AGR, 2018 WL 2121831 at *3 (C.D. Cal. May 8, 2018) (finding 20,000 jobs "meets the legal standard"); *Aguilar v. Colvin*, No. 1:13-cv-01350, 2016 WL 3660296 (C.D. Cal. July 8, 2016) (finding 11,850 national jobs significant) ; *Evans v. Colvin*, No. ED CV 13-01500, 2014 WL 3845046, at *2–3 (C.D. Cal. Aug. 4, 2014) (finding 6,200 national jobs significant); *Hoffman v. Astrue*, No. C09-5252RJB-KLS, 2010 WL 1138340, at *15 (W.D. Wash. Feb. 8, 2010) (finding 9,000 national jobs and 150 regional jobs significant). Based on the foregoing, 23,000 available jobs is a significant number of jobs. The ALJ met the step five burden to establish that there are jobs available in significant numbers in the national economy that Plaintiff could perform, even if certain jobs were erroneously included in the ALJ's calculation. Errors that do not affect the ultimate result are harmless. *See Parra*, 481 F.3d at 747; *Curry v. Sullivan*, 925 F.2d 1127, 1131 (9th Cir. 1990); *Booz v. Sec'y of Health & Human Servs.*, 734 F.2d 1378, 1380 (9th Cir. 1984).

1
2
### CONCLUSION

3          Having reviewed the record and the ALJ's findings, this Court concludes the
4  ALJ's decision is supported by substantial evidence and free of harmful legal error.
5          Accordingly,
6          1. Plaintiff's Motion for Summary Judgment, ECF No. 13, is DENIED.
7          2. Defendant's Motion for Summary Judgment, ECF No. 16, is GRANTED.
8          **IT IS SO ORDERED**.  The District Court Clerk is directed to enter this Order
9  and provide copies to counsel.  Judgment shall be entered for Defendant and the file
10  shall be **CLOSED**.
11          **DATED** September 11, 2023.
12
13                                                  _____
                                                        LONNY R. SUKO
14                                                  Senior United States District Judge
15
16
17
18
19
20
21

ORDER - 36